UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


C-INNOVATION, LLC                           CIVIL ACTION

VERSUS                                      NO: 10-4441

NORDDEUTSCHE SEEKABELWERKE                  SECTION: "J" (5)
GMBH

**ORDER AND REASONS**

Before the Court is Defendant Norddeutsche Seekabelwerke

GmbH ("NSW")'s Motion to Dismiss for Lack of Personal

Jurisdiction (Rec. Doc. 9), Plaintiff's Opposition (Rec. Doc.

37), and Defendant's Reply (Rec. Doc. 41), on supporting

memoranda without oral argument.  Having considered the motion

and legal memoranda, the record, and the applicable law, the

Court finds that Defendant NSW's Motion to Dismiss for Lack of

Personal Jurisdiction (Rec. Doc. 9) should be DENIED.

**PROCEDURAL HISTORY AND BACKGROUND FACTS**

This case arises from the sale of allegedly defective

umbilical cables used in underwater oil and gas exploration.

Plaintiff C-Innovation, LLC ("C-Innovation") is in the business

of operating underwater robots referred to as remotely operated vehicles ("ROV's"), which are used in oil and gas drilling operations.  The umbilical cables at issue serve to tether and connect ROV's to mother ships.  Plaintiff alleges that it purchased a total of 17 umbilical cables that were manufactured by Defendant, 12 of which Plaintiff directly purchased from Defendant.  Plaintiff alleges that it paid roughly $3 million to Defendant for the direct purchases.  Plaintiff's complaint alleges that the cables are defective and fail regularly during their use off the Louisiana shore.  The alleged failures require the cables to be cut and re-terminated.  Plaintiff is a Louisiana limited liability company, and Defendant is a German company. Defendant moved to dismiss for lack of personal jurisdiction. The parties conducted jurisdictional discovery pursuant to this Court's order regarding Plaintiff's motion to compel.

Although the precise nature and sequence of events of the sales of cables made by NSW to C-Innovation are unclear, the following jurisdictional facts are either undisputed or not subject to reasonable dispute.[1]  At least several years prior to

---

[1] "To decide whether a *prima facie* case exists, we must accept as true [Plaintiff's] 'uncontroverted allegations, and resolve in [its] favor all conflicts between the facts contained in the parties' affidavits and other documentation." <u>Nuovo Pignone, SpA v. STORMAN ASIA M/V</u>, 310 F.3d 374, 378 (5th Cir. 2002) (citation omitted).

2

Plaintiff's first purchase of cables from Defendant, Defendant did some degree of sales and promotion of its products in Louisiana and the Gulf of Mexico region.[2]  Plaintiff's employee Norman Robertson contacted Defendant's employee Angus Wing, who at the time worked out of an office in Aberdeen, Scotland. Robertson expressed to Wing Plaintiff's interest in purchasing cables.  Wing communicated this interest to Defendant's office in Germany.

Over the subsequent months, Defendant sent 10 separate quotations to Plaintiff, presumably to its Louisiana location.[3] During this time period that quotations were made, Wing made at least one trip to Louisiana.[4]  He thereafter made two visits to C-Innovation.  The precise nature of these visits is unclear. One of them was in response to the alleged problems that C-Innovation encountered with the cables.  Wing asserts that there was no discussion of sales during these visits, but the visits

---

[2] See Rec. Doc. 37-26, at 6 (Sauerbier Deposition, at 23, ll. 9-10) (in the context of NSW employees' visits to conferences in Louisiana where NSW set up a booth and handed out brochures, NSW corporate representative Ralf Sauerbier stating, "Of course we go to this show to generate sales, yes.").

[3] Rec. Doc. 37-4, at 19 (Wing Deposition, at 73-74) (stating that these quotations were given to the Plaintiff).

[4] Rec. Doc. 37-4, at 17 (Wing Deposition, at 65-67).

pertained to official NSW business.[5]   Plaintiff placed orders
with Defendant, and Defendant then delivered the cables.   Most of
the cables were shipped to Texas, not Louisiana.   However, the
invoices issued by NSW and the bills of lading were shipped to
Mandeville, Louisiana, at Plaintiff's mailing address.[6]   Further,
two of the bills of lading produced in discovery indicate that
there was a direct shipment of cables to Mandeville, not Texas.[7]
Finally, Plaintiff paid for the cables.

    After Plaintiff experienced problems with the cables, there
was additional contact between NSW in Germany and C-Innovation in
Louisiana.   This contact consisted of e-mails between Plaintiff
and Defendant, a visit by NSW technician Martin Kaufman to a
vessel not owned by Plaintiff, and a visit by Mr. Wing.
Eventually, Plaintiff filed the instant suit alleging a cause of
action for redhibition under state law, and alternative claims
for products liability and breach of warranty.   Defendant filed
the instant motion to dismiss for lack of personal jurisdiction.

---

[5] Rec. Doc. 37-4, at 17 (Wing Deposition, at 65-68) (Wing admitting that
the visits to Mandeville were for the purpose of promoting cables and building
relationships).

[6] Rec. Doc. 37-9 (invoices); Rec. Doc. 37-10 (bills of lading).

[7] Rec. Doc. 37-10, at 14-15 (listing both "consignee" and "notify party"
as C-Innovation, and place of delivery as "Mandeville, LA").

## THE PARTIES' ARGUMENTS

Defendant argues that it is a German company that does not have the requisite contacts with Louisiana for this Court to assert personal jurisdiction over it.  It initially argues that the Court lacks general personal jurisdiction because it is a German company that has never maintained an office; a post office box; a telephone number; facilities; or any other substantial, continuous, and systematic contacts in or with the state of Louisiana.  Defendant chiefly argues that specific personal jurisdiction is absent.  It was Plaintiff's employee, Norman Robertson, who reached out to Defendant's employee, Angus Wing, in Scotland.  The sale quote and negotiations occurred between Robertson and NSW personnel in Germany.  NSW had no knowledge regarding whether its products would be used in Louisiana.  The cables were shipped "CIF Houston," meaning that risk of loss and title transferred to C-Innovation upon shipment from Germany. NSW had no knowledge of where the cables would be used upon their arrival in Houston.  Plaintiff's unilateral action in reaching out to NSW does not establish jurisdiction.  The mere exchange of communications between the forum and Germany in consummating and executing a sale does not establish jurisdiction, either.

Defendant also argues that Plaintiff's cause of action does

not arise out of Defendant's contacts with the forum.  It frames its contacts with Louisiana as limited to a business relationship between C-Innovation and Mr. Wing.  Mr. Wing made several visits to Louisiana at C-Innovation's request to develop business.  However, the cause of action does not arise from any event that occurred during these three trips.  No sales were initiated or finalized during Mr. Wing's visits to C-Innovation in Louisiana.  Thus these contacts do not give rise to Plaintiff's claim for redhibition.

Plaintiff's opposition avers that NSW had no fewer than 101 significant business contacts with Louisiana, including quotations, invoices, bills of lading, order confirmations, purchase orders, an on-site service call, and visits to Louisiana from Mr. Wing.  With regard to the sale of cables to Plaintiff, Defendant markets in Louisiana through advertising, attendance at trade shows, and one-on-one relationship building.  These contacts are alleged to support a finding of specific personal jurisdiction.  Plaintiff argues that the "CIF Houston" shipping term does not defeat the foreseeability of the products finding their way to Louisiana because the cables were only shipped to Texas to facilitate spooling onto winches, with the cables' eventual arrival in Louisiana.  Defendant has purposefully

6

availed itself of the benefits of the forum through targeting
Plaintiff as a customer, targeting other companies in Louisiana
and the Gulf region, and communicating extensively with
Plaintiff's employees in Louisiana.  Additionally, the mere act
of entering into the sale of the cables with Plaintiff is
sufficient contact, especially where Defendant knew that the
cables purchased by Plaintiff would be shipped to a Texas
consignee and then would end up in Louisiana.  The invoices
showed that the cables would end up there, and Defendant sent its
employees to Louisiana to work on the sale transaction.

Plaintiff argues that there is also general personal
jurisdiction because Defendant does business in Louisiana:  sales
call visits, advertising, attendance at trade shows that market
to Louisiana companies, entertaining clients in New Orleans,
selling cables to companies with Louisiana operations, and
sending engineers to Louisiana to inspect and repair cables.
These contacts are sufficiently continuous and systematic to
invoke general personal jurisdiction.  Finally, Plaintiff argues
that Defendant has refused to produce all relevant jurisdictional
documents, including expense reports, marketing budgets, invoices
pertaining to other of Defendant's Louisiana customers, and other
pertinent information.

In reply, Defendant argues that its alleged acts giving rise to Plaintiff's claim all occurred outside of Louisiana.  Its only arguably purposeful contacts with Louisiana were the visits to C-Innovation after the purchase request had been made; attendance of a world-wide conference in New Orleans for two days at a time where no Louisiana customers were entertained and no sales made; sending a worker through New Orleans to board another company's vessel; and occasional visits to a Louisiana office of another company.  None of these contacts gave rise to the claims at issue.  All of the communications between Plaintiff and Defendant concerning sale of the ROV cables occurred abroad.  The mere foreseeability that the cables would end up in Louisiana is not sufficient for jurisdiction.  Defendant's closing point is that if NSW was haled into this Court, it would be due to the unilateral act of C-Innovation in initiating a contract and ordering cables from NSW.

### DISCUSSION

**A.  Legal Standard**

The Fifth Circuit has stated the legal standard by which a district court must adjudicate a motion to dismiss for lack of personal jurisdiction:

> Where a defendant challenges personal jurisdiction, the
> party seeking to invoke the power of the court bears

8

the burden of proving that jurisdiction exists. <u>Wyatt v. Kaplan</u>, 686 F.2d 276, 280 (5th Cir.1982). The plaintiff need not, however, establish jurisdiction by a preponderance of the evidence; a prima facie showing suffices. <u>Id.</u> This court must resolve all undisputed facts submitted by the plaintiff, as well as all facts contested in the affidavits, in favor of jurisdiction. <u>Id.</u>

The Due Process Clause of the Fourteenth Amendment guarantees that no federal court may assume jurisdiction in personam of a non-resident defendant unless the defendant has meaningful "contacts, ties, or relations" with the forum state. <u>Int'l Shoe Co. v. Washington</u>, 326 U.S. 310, 319, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Jurisdiction may be general or specific. Where a defendant has "continuous and systematic general business contacts" with the forum state, <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 415, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), the court may exercise "general" jurisdiction over any action brought against that defendant. <u>Id.</u> at 414, 104 S.Ct. 1868 n. 9. Where contacts are less pervasive, the court may still exercise "specific" jurisdiction "in a suit arising out of or related to the defendant's contacts with the forum." <u>Id.</u> at 414, 104 S.Ct. 1868 n. 8. This case presents only the question of specific jurisdiction.

A federal court may satisfy the constitutional requirements for specific jurisdiction by a showing that the defendant has "minimum contacts" with the forum state such that imposing a judgment would not "offend traditional notions of fair play and substantial justice." <u>Int'l Shoe</u>, 326 U.S. at 316, 66 S.Ct. 154. In <u>Nuovo Pignone v. STORMAN ASIA M/V</u>, 310 F.3d 374 (5th Cir.2002), we consolidated the personal jurisdiction inquiry into a convenient three-step analysis: "(1) whether the defendant ... purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting activities there; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3)

whether the exercise of personal jurisdiction is fair
and reasonable." Id. at 378 (citing Burger King Corp.
v. Rudzewicz, 471 U.S. 462, 474, 105 S.Ct. 2174, 85
L.Ed.2d 528 (1985)). The forum state may create, and
this court would be bound to apply, additional
jurisdictional restrictions by statute, Adams, 220 F.3d
at 667, but Louisiana's "long-arm" statute extends
jurisdiction to the constitutional limit, La. R.S.
13:3201(B), so the two inquiries in this case fold into
one.

Luv N' Care, Ltd. v. Insta-Mix, Inc., 438 F.3d 465, 469 (5th Cir.

2006), cert. denied, 548 U.S. 904 (2006) (footnotes omitted).

**B.   Jurisdictional Analysis**

     In accordance with the test set forth above, the Court first

proceeds to determine whether Defendant has maintained the

requisite contacts with Louisiana such that it purposefully

availed itself of the privilege of conducting activities in the

forum.  Only if those contacts meet the constitutional minimum

will the Court proceed to the other two steps in the

jurisdictional analysis.

   **1.  Minimum Contacts**

      **a.  Nature of Contacts**

     As to whether Defendant established the requisite minimum

contacts with the forum, the Court addresses a characterization

quandary.  One viewpoint is that this is a case where a

manufacturer has sent its product into the forum with the

foreseeability that the product would arrive in the forum.  This is the "stream-of-commerce" paradigm.  On the other hand, one could view this case as more of a "one-shot deal":  NSW did not place its product into the stream of commerce—such that it eventually came into the hands of Plaintiff—but Defendant merely responded to Plaintiff's order of cables.  Still, at least as to five of the cables, there was an intermediate seller between Defendant and Plaintiff, such that a stream-of-commerce analysis may be suitable.

Superficially, the adoption of a "one-transaction" or a "stream-of-commerce" paradigm would not seem to matter for a minimum contacts analysis in this case.  Even as to the "one-time" sale of 12 cables directly to C-Innovation, because NSW was not only the seller, but also the manufacturer of the cables, a "stream-of-commerce" approach suggests that it was more than foreseeable that the cables would make their way into the forum.  However, Fifth Circuit jurisprudence shows that the choice of one paradigm instead of another can lead to a diametrically opposite result.  In a case involving a defendant who places a product into the stream of commerce, the plaintiff has a much easier time proving jurisdiction based on the Fifth Circuit's "mere foreseeability" test.  See Luv N' Care, 438 F.3d 465.  However,

11

where sales into the forum are characterized as isolated or sporadic, the Fifth Circuit has concluded jurisdiction would not be proper.  See Stuart v. Spademan, 772 F.2d 1185, 1187 (5th Cir. 1985); Charia v. Cigarette Racing Team, Inc., 583 F.2d 184 (5th Cir. 1978).

In the stream-of-commerce context, the court in Luv N' Care recognized that the Fifth Circuit "has consistently held that 'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce.'"  438 F.3d at 470.  The "mere foreseeability" test is "more relaxed" than the approach suggested by the Asahi Metal Industry Co. v. Superior Court, 480 U.S. 102 (1987) plurality—which required additional action beyond placing a product into the stream of commerce.  Luv N' Care, 438 F.3d at 470.  The court found that the stream-of-commerce principle applies mainly to products liability cases, but extended the principle in Luv N' Care to a copyright and trademark infringement case where a non-resident defendant sold the product at issue to Wal-Mart, which in turn sold the product in Louisiana.  Id. at 468.  The court rejected the non-resident manufacturer's argument that retailer Wal-Mart had complete

12

control over the ultimate destination of the goods, where the
invoices to Wal-Mart listed Louisiana distribution centers.  Id.
at 470-71.  Under the Luv N' Care analysis, NSW should have
foreseen the cables finding their way into the forum because NSW
directly sent the invoices to C-Innovation's Mandeville,
Louisiana location.  Such an analysis would lead to a finding for
Plaintiff.

On the other hand, if one characterizes this case not as a
stream-of-commerce issue, but as a matter of NSW establishing a
relationship with the forum via a contract of sale, Plaintiff's
argument for jurisdiction is arguably weaker.  The mere fact that
a non-resident contracts with a forum resident is not sufficient
to establish the forum's jurisdiction.  Colwell Realty
Investments, Inc. v. Triple T Inns of Arizona, Inc., 785 F.2d
1330, 1334 (5th Cir. 1986).  Where a contract is alleged to be a
"contact," the court must look to prior negotiations,
contemplated future consequences, contractual terms, and the
parties' actual course of dealing.  Burger King Corp. v.
Rudzewicz, 471 U.S. 462, 479 (1985).

In Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773 (5th Cir.
1986), cert. denied, 481 U.S. 1015 (1987), the court held that
under the facts presented, where the contract was performed

13

outside the forum and communications into the forum were due to the mere fortuity of the plaintiff's residence there, the defendant's contacts were insufficient to establish specific personal jurisdiction.  The suit arose out of the alleged breach of a joint operating agreement regarding an oil and gas drilling venture.  Id. at 776.  The non-resident defendant's only contacts with the forum were (1) a contract with a resident corporation; (2) the defendant sent a final revised agreement to the forum state; (3) the defendant sent three checks into the forum in partial performance of contractual obligations; and (4) the defendant engaged in extensive telephonic and written communications with the plaintiff in the forum.  Id. at 777-78. The court held that specific personal jurisdiction was absent because the exchange of communications between the forum and the defendant's state of residence owed to the mere fortuity of the plaintiff's residence in the forum.  Id. at 778.  Additionally, performance of the contract was centered outside the forum.  Id.

In Stuart, 772 F.2d 1185, the court held that under the facts presented, jurisdiction was absent because the mere shipment of goods into the forum and communications in development of the contract were not sufficient.  The plaintiffs were forum residents who contracted with a non-resident; they

14

assigned patent rights to the non-resident defendant in exchange
for the promise of payments.  Id. at 1188.  Relevant to the
breach of contract action, the defendant had several contacts
with the forum:  a contract with forum residents; the defendant
shipped into the forum ski bindings that were the subject of a
modification to be patented; the defendant exchanged phone calls
and letters into the forum regarding the patent assignment; the
agreement had a forum choice-of-law provision; the defendant's
company advertised in and shipped its products to the forum; and
the defendant's company marketed the patented ski bindings in the
forum.  Id. at 1192.  The court found specific personal
jurisdiction absent because the mere shipment of goods into the
forum at the instigation of a resident plaintiff is not enough,
the exchange of communications between a resident and a non-
resident in development of a contract is insufficient, and the
agreement at issue did not contemplate the long-term relationship
and continuing obligations necessary for jurisdiction.  Id. at
1193-94.

     If Harvey and Stuart apply, they present formidable hurdles
for C-Innovation to overcome.  One of Plaintiff's main arguments
is that there is a high volume of contacts with the forum related
to consummation and execution of the contract, or contracts, to

sell the umbilical cables, such that jurisdiction is proper. Namely, Plaintiff points to an alleged 11-step process involving quotations, purchase decisions, order placement, order confirmation, delivery, invoicing, and payment.  However, under Harvey and Stuart, the mere happenstance that the exchange of communications involves a forum resident does not lead to a finding of jurisdiction.  Although Harvey can be distinguished to the extent the contract therein was to be performed outside the forum, Stuart is more on point.  Under Stuart, the exchange of communications between Defendant and Plaintiff and the shipment of goods that eventually arrived in Louisiana—by themselves—are insufficient contacts.

Even more factually similar is Charia, 583 F.2d 184.  In Charia, a Louisiana plaintiff sued a non-resident defendant in redhibition based upon an alleged defect in a boat shipped from Florida.  The court listed the pertinent contacts with Louisiana as follows:  the sale of a product to a forum resident; telephone and mail negotiations between a non-resident defendant and a resident plaintiff; national advertising; the defendant's receipt of the plaintiff's checks drawn on a forum bank; the defendant's knowledge that the boat would be ported in the forum; the defendant's arrangement for shipping to the forum; the sale of

three other boats to forum residents; and the allegation of a
personal injury in addition to the redhibition claim.  Id. at
185.  The court found that the "locus of the contract" was
Florida, where the face-to-face discussions and product
manufacture took place.  Id. at 188.  It also found that where
title and risk of loss passed to the plaintiff upon shipment, and
because the stream-of-commerce theory was not applicable, the
court lacked in personam jurisdiction over the defendant.  Id. at
189-90.[8]

        Charia is factually similar to the present case.  Both cases
involve the sale of a product into the forum state.  Both involve
a series of communications between the non-resident defendant
outside the forum and the resident plaintiff in the forum,
although some of the communications in the present case were by
e-mail rather than phone or mail.  In both cases, which raised
redhibition claims, it was the plaintiff/forum resident who
initiated the contact that ultimately led to the sale.  Perhaps
most importantly, the Charia court held that even where the non-
resident defendant knew that its sale to a forum resident would
lead to the product entering the forum, there was no personal

---

        [8] The Court discusses infra the validity of the Charia court's
distinction based on shipping terms under subsequent case law, as well as the
applicability of the court's stream-of-commerce reasoning to the present case.

17

jurisdiction.  To the extent _Charia_ is binding, therefore, irrespective of whether NSW reasonably could have foreseen that the cables would be sent into Louisiana, there would be no specific personal jurisdiction.

Additionally, the breach-of-contract cases cited by Plaintiff are not binding because they are distinguishable. Plaintiff argues that the court's decision in _Quasha v. Shale Development Corp._, 667 F.2d 483 (5th Cir. 1982), stands for the proposition that sending an offer into the forum is sufficient for jurisdiction and that _a fortiori_, in the present case, sending a product into the forum pursuant to a completed contract is sufficient.  However, the _Quasha_ finding of jurisdiction was based on the fact that performance was to be rendered in Louisiana.  _Id._ at 489.  Additionally, reliance on _Southern Investors II v. Commuter Aircraft Corp._, 520 F. Supp. 212 (M.D. La. Aug. 18, 1981) is misplaced.  There, the court found jurisdiction where there was not only a loan agreement of $38 million, but also a continuing relationship established by loan servicing obligations.  _Id._ at 216.  In contrast, the present case involves a contract of sale that did not entail obligations to be performed over a long period of time.  Therefore, clearly, under breach-of-contract cases like _Charia_, it is harder for a

18

plaintiff to prove that the mere sale of a product into the forum establishes jurisdiction.  However, where a stream-of-commerce analysis akin to that performed in <u>Luv N' Care</u> applies, the relaxed "mere foreseeability" test is much easier for a plaintiff to meet.

**b. Application**

As noted, the facts of this case present elements similar to the <u>Charia</u>, <u>Harvey</u>, and <u>Stuart</u>  cases, which involved an exchange of communications that ultimately led to a shipment into the forum state.  Under this jurisprudence, Plaintiff would need to point to additional contacts to establish jurisdiction.  However, as previously stated, there are also "stream-of-commerce" aspects of this case.  Although 12 of the cables at issue were directly sold from NSW to C-Innovation, 5 others manufactured by NSW were sold by intermediary companies to C-Innovation.  Thus at least as to 5 of the 17 cables, this case presents a stream-of-commerce paradigm.  Although NSW was not the immediate seller, based on its promotion of umbilical cables to other Louisiana companies like Oceaneering,[9] it should have reasonably foreseen that the cables would make their way into the forum.  And under Fifth

---

[9] Rec. Doc. 37-4, at 8 (Wing Deposition, at 30, ll. 14-15) ("I've sold nothing in Louisiana except to Oceaneering."); <u>see</u> <u>also</u> <u>id.</u> at 17 (Wing Deposition, at 68, ll. 20-23).

Circuit precedent, this is all that is required for an assertion of personal jurisdiction.

Even if the Court, instead, were to view this case under the *Charia* "one-time sale" paradigm, Plaintiff could establish the requisite contacts.  Some federal courts using this paradigm have found jurisdiction in cases like the one at bar.  The court in the recent case of *SouthCo, Inc. v. Fivetech Technology Inc.*, 2011 WL 71440, at *10 (E.D. Pa. Jan. 10, 2011) cited case law stating that the one-time sale of a product into the forum by a non-resident defendant is sufficient contact to establish personal jurisdiction, even where, as in this case, "the plaintiff had 'reached out' to the defendant to consummate the sale."  *Id.* (citing *Precimed S.A. v. Orthogenesis, Inc.*, 2004 WL 2630596 (E.D. Pa. Nov. 17, 2004)); *see also Osteotech, Inc. v. Gensci Regeneration Sciences, Inc.*, 6 F. Supp. 2d 349, 354 (D.N.J. May 4, 1998); *cf. Austin v. N. Amer. Forest Products*, 656 F.2d 1076, 1090-91 (5th Cir. 1981) (holding that a non-resident defendant manufacturer was subject to personal jurisdiction where it knew that doors it sold would be used in the forum state and sent a written representation of the doors' quality into the forum).  Even if this case presents a one-time sale, that sale was an involved one.  Defendant prepared 10 quotations over a

period spanning over one year and made several shipments of cable
to Plaintiff.  Discovery produced two purchase orders and four
order confirmations.  Defendant mailed a number of separate
invoices to Plaintiff at its Mandeville location.[10]

The touchstone of the analysis is "whether the defendant ...
purposely directed its activities toward the forum state or
purposely availed itself of the privileges of conducting
activities there."  Luv N' Care, 438 F.3d at 470.  The Court
agrees with Defendant that some of the contacts mentioned by
Plaintiff do not indicate an intentional availment of the
protection and benefits of doing business in Louisiana.  For
example, the mere fact of promotion of cables to companies with a
presence in Louisiana may not constitute purposeful availment
where such cables are not to be used in the forum, but rather
somewhere offshore—whether that be off the Louisiana coastline or
elsewhere.  NSW's technician, Martin Kaufman, visited New Orleans
in connection with Plaintiff's report of defective cables, but
his flight into Louisiana can be seen as coincidental to the

_____

[10] The Court acknowledges that "[a]n exchange of communications in the
course of developing and carrying out a contract" is not enough, by itself, to
invoke jurisdiction.  Moncrief Oil Int'l Inc. v. OAO Gazprom, 481 F.3d 309,
312 (5th Cir. 2007).  However, in this case the prolonged nature of the
communications over several months and the volume of effort that Defendant put
into the sale is a factor weighing in favor of a finding of jurisdiction.

extent that he merely needed to travel to a location from which he could then travel by boat to an offshore location where the cables were in use.  Other of Plaintiff's jurisdictional allegations find scant support, such as allegations concerning certain of Wing's alleged trips through Louisiana, the purposes thereof, and that Defendant advertised in the forum.

However, there are enough *supported* facts to prove that based on its conduct, Defendant should have reasonably expected to be haled into court in Louisiana should its cables malfunction.  The sales to C-Innovation were more than a "one-shot deal."  Although Defendant emphasizes that the three trips by Mr. Wing to visit with C-Innovation in Louisiana did not lead to a sale or involve negotiations, the Court is not persuaded that the visits are not probative.  Wing admitted that the visits were related to promotion of the cables.[11]  The first visit in 2007 was the result of Robertson's invitation, and Wing asserts that the visit was about general relationship building.[12] However, he also implied that he made the trip because of the

---

[11] Rec. Doc. 37-4, at 17 (Wing Deposition, at 65, ll. 21-25).

[12] Rec. Doc. 37-4, at 17 (Wing Deposition, at 66-67).

22

quotations that NSW had made concerning cable prices.[13]  Thus the
visit was likely to seal the deal, but at least was intended to
maintain a relationship with this Louisiana customer for future
sale opportunities.  As to the second visit in 2008, Wing
indicated that the impetus was to meet with a C-Innovation
employee who was C-Innovation's new purchasing supervisor.[14]  As
to the third visit, NSW sent Mr. Wing to Louisiana to investigate
the alleged problems with the cables; it also sent an engineer to
investigate problems encountered with the cables in the Gulf
generally.[15]  This suggests an intention to remedy any perceived
wrongs via a customer service initiative directly in the forum
that would maintain the goodwill NSW had with current Louisiana
clients and leave open the door for future sale opportunities in
the forum.

The nature of the product sold into the forum is notable.
Each cable sold for several hundreds of thousands of dollars, and
due to its high-profile nature as an expensive component of

---

[13] Rec. Doc. 37-4, at 17 (Wing Deposition, at 67, ll. 10-12) ("Sales is
part of everything we do. If I felt that it was relevant to go there -- *after
all, we had quoted* -- I would go.") (emphasis added).

[14] Rec. Doc. 37-4, at 17 (Wing Deposition, at 67, ll. 21-24).

[15] Rec. Doc. 37-4, at 17 (Wing Deposition, at 67, line 23 through 68,
line 9); Rec. Doc. 37-4, at 28 (Wing Deposition, at 110-11); Rec. Doc. 37-4,
at 30 (Wing Deposition, at 120).

costly undersea exploration, it should reasonably be expected that some ongoing relationship would exist between the seller and a buyer like C-Innovation.  Even though Defendant apparently sold no cables *directly* into Louisiana to *this Plaintiff*, the product's known use in the Gulf region is also significant.  Even as to the sales to the intermediaries from whom Plaintiff purchased 5 cables, and as to the 12 cables sold into Texas, it was reasonably foreseeable that the product would be used by a Louisiana entity that could suffer injury there.

The mere fact that Plaintiff's employee, Norman Robertson, "fired the first shot," expressing interest in NSW's product, does not mean that subsequent actions by Defendant could not constitute the requisite contacts.[16]  If Defendant had responded to Mr. Robertson's inquiry with a mere quotation, or a mere shipment of goods, the result might be different.  But Defendant continued a relationship with Plaintiff in the forum that constituted more than closing a one-time sale.  As to the 12 cables sold directly to C-Innovation, without the benefit of a stream-of-commerce paradigm, it may be a close call.

---

[16] In fact, in spite of the not insubstantial discovery in the record, it is still unclear to the Court as to how Plaintiff found out that Defendant manufactured cables, whether through word of mouth, trade shows, or some other means.  However, it seems that due to Mr. Robertson's and Mr. Wing's prior acquaintance, Mr. Robertson reached out to Mr. Wing, who was working in Scotland for NSW at the time.

24

Nonetheless, based on NSW's conduct and connection with Louisiana, it should have reasonably anticipated being haled into court here.  See World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

The Court finds that Charia does not bar the result reached today.  First, the Fifth Circuit noted that "Charia was decided before several important Supreme Court cases, including World-Wide Volkswagen, 444 U.S. 286, 100 S.Ct. 559, and Burger King, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528, had been decided." Nuovo Pignone, 310 F.3d at 380 n.4.  Second, the court premised its decision not to apply the "'stream-of-commerce' theory" on the fact that four sales into the forum in five years were isolated and sporadic sales.  Charia, 583 F.2d at 189.  In the present case, over a relatively short time span, Defendant shipped 12 cables to Plaintiff.  Third, the Charia court found that the locus of the contract was Florida, partly due to the fact that the forum resident had made several trips to the non-resident defendant's state of residence to negotiate the sale. Id. at 188.  Lastly, the court concluded that the "FOB Miami" shipping term, with title passing and risk of loss transferring to the plaintiff in Florida, weighed against a finding of purposeful availment of the forum.  Id. at 189.  In this case,

Defendant relies on a similar argument concerning the "CIF Houston" shipping term.[17]  However, the Fifth Circuit has since made clear that jurisdiction "does not depend on the technicalities of when title passes," and that a shipping term does not necessarily prevent a court from exercising personal jurisdiction.  <u>Luv N' Care</u>, 438 F.3d at 471-72.  And here, where the cables were sent to Houston to be spooled onto winches, and then inevitably shipped to where Plaintiff resided, it was foreseeable despite the shipping term that the cables would be available for use in the forum.

**2.  Relationship of Contacts to Cause of Action**

The second requirement is that the plaintiff's cause of action must arise out of or be related to the defendant's contacts with the forum state.  The Court first acknowledges several contacts cited by Plaintiff that cannot satisfy the "arising out of" test.  Defendant's entertainment expenses in the forum were not for C-Innovation, and Defendant's corporate representative Ralf Sauerbier testified that the trade shows are about networking—Sauerbier has never made a sale at a show.[18]

---

[17] Defendant argues that this term, which stands for "Cost, Insurance, and Freight," indicates that title passed and risk of loss transferred upon the shipment from Germany; and that this weighs against jurisdiction.

[18] Rec. Doc. 38-1, at 7 (Sauerbier Deposition, at 21, ll. 1-6); at 31-32 (Sauerbier Deposition, at 48, line 13 through 49, line 3).

The mere fact that trade show attendance was intended to generate sales does not change the fact that there is no causal relationship between these trade shows and C-Innovation's purchase of cables, which was initiated by Robertson.  However, the Court has found that the relevant contacts are the sale and the various visits by Mr. Wing and Mr. Kaufman to cement the customer relationship with C-Innovation.  Without these contacts, Plaintiff would not have obtained umbilical cables that are allegedly dysfunctional.  Thus the cause of action arises from Defendant's contacts with Louisiana.

The Plaintiff's alternative claims for products liability and redhibition are directly causally related to the Defendant's sale of umbilical cables that Defendant should reasonably have foreseen entering the forum.  To the extent the "minimum contacts" include visits made by Mr. Wing to cement the business relationship and to inquire into the alleged product failures, the claims at issue are at the least "related to" these contacts because Plaintiff's decision to prosecute its claims in federal court necessarily results from a failure of Wing's and Kaufman's visits to satisfy Plaintiff's desire for functional cables.  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414, 414 n.8 (1984) (stating that specific personal jurisdiction

27

involves a controversy "related to" or arising out of the
defendant's contacts with the forum).

### 3.  Fairness Factors

Because C-Innovation's cause of action arises out of and is
related to NSW's contacts with the forum, an exercise of
jurisdiction would only be unconstitutional if it did not comport
with "traditional notions of fair play and substantial justice."
International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).
Because Plaintiff has established a *prima facie* case of personal
jurisdiction, "the burden of proof shifts to the defendant to
show that the assertion of jurisdiction is unfair and
unreasonable."  Nuovo Pignone, 310 F.3d at 382.  Thus the Court
considers the "fairness factors":  "(1) the burden on the
nonresident defendant; (2) the interests of the forum state; (3)
the plaintiff's interest in obtaining relief; (4) the interstate
judicial system's interest in the most efficient resolution of
controversies; and (5) the shared interests of the several states
in furthering fundamental social policies."  Id.

The Court finds that the factors weigh in favor of an
exercise of personal jurisdiction.  The burden on the Defendant
is not unseemly.  The Defendant regularly promotes its products
to customers in the Louisiana market, and even more so to the

28

general ROV market in the Gulf region.  The regular visits made by NSW employees to entertain and otherwise maintain contact with customers in Louisiana demonstrate that it is not beyond Defendant's means to travel to the forum for the purpose of defending a lawsuit.  Louisiana has an interest in permitting its resident to seek redress of alleged harm.  Additionally, if Plaintiff were unable to litigate its claims here, it is not immediately apparent where else the claims could be brought other than in Germany.  The witnesses who would testify about the cables' performance or lack thereof are presumably mainly located in or near the forum.  Maintenance of this suit in this forum comports with due process.

Because the Court finds that it has specific personal jurisdiction over NSW as to C-Innovation's claims in this case, it does not reach the issue of whether general personal jurisdiction is also present.  Plaintiff has made a *prima facie* showing of personal jurisdiction, which Defendant has not rebutted.

For the foregoing reasons, **IT IS ORDERED** that Defendant NSW's Motion to Dismiss for Lack of Personal Jurisdiction (Rec. Doc. 9) is **DENIED**.

New Orleans, Louisiana this 1st day of November, 2011.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE