## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**C-INNOVATION, LLC,**                                            **CIVIL ACTION**
    **Plaintiff**

**VERSUS**                                                        **No. 10-4441**

**NORDDEUTSCHE**                                                  **SECTION "E"**
**SEEKABELEWERKE GMBH,**
    **Defendant**

### ORDER AND REASONS

Before the Court is defendant Norddesutsche Seekabelewerke GMBH's ("NSW")

motion for summary judgment[1] on plaintiff C-Innovation, LLC's ("C-Innovation") claims

based on the Louisiana Products Liability Act ("LPLA"), redhibition, and breach of express

warranty. For the reasons set forth below, NSW's motion is denied in its entirety.

### BACKGROUND

The facts of this case, and the grounds for C-Innovation's causes of action against

NSW, have been fully explored in other orders.[2]  The Court will not repeat that background

information here, but will address specific factual issues with respect to each of C-

Innovation's claims herein.

### ANALYSIS

**I.      Summary Judgment Standard**

Summary judgment is appropriate only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

[1] R. Doc. 127.

[2] *See, e.g.* R. Doc. 42 (Order denying NSW's motion to dismiss for lack of personal jurisdiction); *see also* R. Doc. 201 (Order granting in part and denying in part NSW's motion to dismiss C-Innovation's fraud claim).

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56 ; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (quoting *Golden Rule Ins. Co. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)).  If the moving party fails to carry this burden, the motion must be denied.  If the moving party successfully carries this burden, the burden then shifts to the non-moving party to show that a genuine issue of material fact exists. *Celotex*, 477 U.S. at 322-23.  Once the burden has shifted, the non-moving party must direct the Court's attention to something in the pleadings or other evidence in the record that sets forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.  *Id*. at 324.  The non-moving party cannot simply rely on allegations or blanket denials of the moving party's pleadings as a means of establishing a genuine issue of material fact, but instead must identify specific facts that establish a genuine issue for trial. *Littlefield v. Forney Indep. Sch. Dist*., 268 F.3d 275, 282 (5th Cir. 2001).  Likewise, an affidavit cannot be used to preclude summary judgment unless its contains competent and otherwise admissible evidence.  *See* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated").  "[A] self-serving affidavit, without more evidence, will not defeat summary judgment." *Sanchez v. Dallas/Fort Worth Int'l Airport Bd*., 438 F. App'x

343, 346-47 (5th Cir. 2011) (citing *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 & n.49 (5th Cir. 2005)); *see also United States v. Lawrence*, 276 F.3d 193, 197 (5th Cir. 2001); *BMG Music v. Martinez*, 74 F.3d 87, 91 (5th Cir. 1996). If the dispositive issue is one on which the non-moving party will bear the burden of proof at trial, however, the moving party may satisfy its burden by simply pointing out that the evidence in the record is insufficient with respect to an essential element of the non-moving party's claim. *See Celotex*, 477 U.S. at 325.

 "An issue is material if its resolution could affect the outcome of the action." *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005). When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150-51 (2000). All reasonable inferences are drawn in favor of the non-moving party. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law. *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002).

### II. C-Innovation's Redhibitory Action

 C-Innovation alleges the cables at issue were defective and thus in violation of the implied warranty against redhibitory defects. *See* La. Civ. Code Ann. art. 2520, *et seq*. As the party asserting a claim for redhibition, the burden of demonstrating that the cables were defective lies with C-Innovation. *See, e.g., Cazaubon v. Cycle Sport, LLC*, 11-289 (La. App.

1 Cir. 11/9/11); 79 So.3d 1063, 1065.

NSW's original motion for summary judgment and memorandum in support do not address whether the cables were or were not defective.[3]  In NSW's supplemental Local Rule 56.1 statement of uncontested material facts,[4] NSW argues for the first time that C-Innovation cannot meet its burden of proving the cables were unreasonably dangerous and thus defective for LPLA purposes.  The issue of whether the cables were unreasonably dangerous is an issue of fact.  *See Hines v. Remington Arms Co.*, 94-455 (La. 12/8/94); 648 So.2d 331, 335 ("Whether a product is unreasonably dangerous, and thereby is defective, is a question of fact to be made by the factfinder.") (internal citations omitted); *see also Taylor v. American Laundry Mach., Inc.*, 27121-CA, (La. App. 2 Cir. 6/23/95); 658 So.2d 288, 291, *writ denied*, 95-1877 (La. 11/3/95); 661 So.2d 1385.  It is clear from the record this issue is very much in dispute.  Nevertheless, NSW argues in its summary judgment motion that there are no issues of material fact with respect to certain of its defenses because, even if the cables were defective, NSW's defenses would prevail.  Accordingly, for purposes of assessing NSW's right to summary judgment on its defenses, the Court assumes the cables were defective.

NSW's defenses are that, even if the cables were defective, C-Innovation's redhibitory action is prescribed; the cables met C-Innovation's specifications; C-Innovation waived its right to bring an action for a breach of the implied warranty against redhibitory defects; and C-Innovation's continued use of the cables precludes a redhibitory action.  NSW argues

---

[3] *See* R. Doc. 127 (NSW's motion for summary judgment); R. Doc. 127-1 (NSW's memorandum in support).

[4] R. Doc. 166.

4

there are no facts in dispute with respect to these defenses and it is entitled to prevail on these defenses as a matter of law. Because NSW will bear the burden of proving these affirmative defenses at trial, its burden at the summary judgment stage is to demonstrate, with specific citations to competent record evidence, that there are no genuine issues of fact and that NSW is entitled to the protection of each defense as a matter of law. The Court finds material facts are in dispute with respect to each defense and that, in some instances, even if there were no factual disputes NSW would not be entitled to judgment as a matter of law.

### A.   NSW's Defense that C-Innovation's Redhibitory Action is Prescribed

NSW argues that, even assuming the cables were defective, C-Innovation's redhibitory action is prescribed, and thus that claim fails as a matter of law. Under Louisiana law, a manufacturer is presumed to know of defects in its products. *See* LA. CIV. CODE ANN. art. 2545;[5] *see also Encalade v. Coast Quality Const. Corp.*, 00-925 (La. App. 5 Cir. 10/31/00); 772 So.2d 244, 247, *writ denied*, 00-3229 (La. 1/26/01); 782 So.2d 634. Because NSW was the manufacturer of the cables at issue and is presumed to know of the defect in its product, the one year prescriptive period on C-Innovation's redhibitory action began to run the day C-Innovation discovered the defect in the cables. See LA. CIV. CODE ANN. art. 2534(B).[6] Prescription does not begin to run on a redhibitory action simply

---

[5] Article 2545 provides, in pertinent part, that "[a] seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing." LA. CIV. CODE ANN. art. 2545.

[6] Article 2534 provides as follows:

> The action for redhibition against a seller who did not know of the existence of a defect in the thing sold prescribes in four years from the day delivery of such thing was made to the buyer or one year from the day the defect was discovered by the buyer, whichever occurs first. . . . The action for

because a plaintiff suspects something might be wrong.  *See Chevron USA, Inc. v. Aker Maritime, Inc.*, 604 F.3d 888, 894 (5th Cir. 2010).  Instead, the prescriptive period begins to run when the plaintiff has a "reasonable basis to pursue a claim against a specific defendant."[7]  *Id.* (internal citation omitted).

NSW has the burden of proving C-Innovation's redhibitory action is prescribed.  It is undisputed that C-Innovation experienced a "ground fault" in one of its umbilical cables in October 2007.[8]  It is also undisputed that, in a September 2012 deposition, C-Innovation's corporate representative Steven Thrasher ("Thrasher") testified that in March 2009, C-Innovation identified the cause of the "z-kinking" issues C-Innovation was experiencing as being on the "umbilical side" of its operation, meaning the issues were somehow related to the umbilical cables C-Innovation was using to tether its ROVs to ships.[9]  Thrasher made this determination when C-Innovation experienced z-kinking issues even after it attached the cables to a fixed platform instead of a vessel bobbing in the sea.[10]

---

redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer.

LA. CIV. CODE ANN. art. 2534.

[7] Louisiana jurisprudence requires that all prescription statutes be strictly construed against prescription.  *See Wimberly v. Gatch*, 93-2361 (La. 4/11/94); 635 So.2d 206, 211.

[8] *See* R. Doc. 169 at p. 12 (C-Innovation admits it experienced a ground fault in October 2007); *see also* R. Doc. 127, Ex. 20 (October 18, 2007 email from Norm Robertson to Steven Thrasher related to October 2007 ground fault).

[9] *See* R. Doc. 128, Ex. 2 (Steven Thrasher Dep., 86:21 - 87:2, Sept. 6, 2012) ("Q: So when was that that you determined it was an umbilical issue? A: I determined it whenever we installed the systems on onto the Rowan Gorilla on UHDs. Q: When was that? A: It was March-ish - - it was March of 2009, I believe."); *see also id*. at 84:10 -85:22.

[10]*See* R. Doc. 128, Ex. 2 (Thrasher Dep., 84:10 - 85:22,  Sept. 6, 2012) ("Q: What investigations did C-Innovation do to try to determine the cause of the cable failures? A: we put [the NSW cables] on board [a Rowan Gorilla jack up vessel, a fixed platform] and then they continued to fail and that's when we automatically knew that it was definitely a problem on the umbilical side.  So as far as investigating a

6

This lawsuit was filed in December 2010.[11]  NSW points to Thrasher's testimony regarding C-Innovation's identification in March 2009 of the cause of the z-kinking being on the umbilical side of its operation[12] to prove C-Innovation's redhibitory action is prescribed.  In response, while C-Innovation admits that a ground fault was experienced in a cable in October 2007[13] and that the umbilical side of C-Innovation's operation was identified as a problem in March 2009,[14] C-Innovation argues it did not have a reasonable basis to pursue a claim against NSW based on the defect in NSW's design of its cables until July 2010, when a Schilling employee emailed Thrasher stating the cause of the z-kinking to be a defect in NSW's design of the cables.[15]  Thus, C-Innovation argues its claim has not prescribed.

The Court finds C-Innovation has satisfied its burden of pointing to specific evidence in the record demonstrating an issue of fact exists with respect to when C-Innovation "discovered" the defect in NSW's design of its cables, defined under the jurisprudence as

_____

cause, whether it was something wrong with the umbilical or whether it was something with the way it was being operated or this and that . . . we knew it was in fact the umbilical); *Id*. at 86:9-15 ("So as far as an actual investigation, besides whether it was operator issue or the way they were maintaining the cables or the cable itself, that's as far we got . . . there became a point where we knew for a fact there was an umbilical issue, then we replaced - - we stopped buying umbilicals altogether.").

[11] *See* R. Doc. 1 (Complaint).

[12] *See supra* notes 9 & 10.

[13] *See* R. Doc. 169 at p. 12; *see also* R. Doc. 127, Ex. 20.

[14] *See supra* notes 9 & 10.

[15] *See* R. Doc. 153, Ex. 10 (Thrasher Dep., 165:6-19, Sept. 6, 2012) ("Q: Okay.  When was the first time that you became aware that a defect in the cable was the cause for the ongoing Z-kinking that the cables were experiencing?  A: When [Schilling employee] Jeff Small had sent me an e-mail confirming such.  Q: When was that?  A: It's in an e-mail.  July, maybe.  Q: July 2010?  A: Honestly, I don't recall, but it's in here.  It's in his pile of papers.  Q: But it was after the testing?  A: It was definitely after the testing.")

having a reasonable basis to pursue a claim against NSW.[16]  In his affidavit, Steven Thrasher states that C-Innovation's knowledge in March 2009 did not mean C-Innovation knew the z-kinking issues were NSW's fault at that time.[17]  Instead, Thrasher and C-Innovation had eliminated the vessel moving around in the sea as a potential cause of the z-kinking but had not yet determined what the cause was.[18]  A genuine issue of material fact exists with respect to when C-Innovation had knowledge sufficient to start the running of prescription under Louisiana Civil Code article 2534(B).  NSW is not entitled to summary judgment on its defense that C-Innovation's redhibitory action is prescribed.

### B.    NSW's Defense that the Cables Met C-Innovation's Specifications

NSW also argues the cables at issue met the Schilling design specifications C-Innovation relied upon when purchasing NSW-manufactured cables from Schilling and Phoenix,[19] and also when purchasing NSW-manufactured cables directly from NSW.[20] Because the cables met these specifications, NSW argues, C-Innovation's redhibitory action fails as a matter of law.  Under Louisiana law, a seller may avoid liability in redhibition if it can prove that its product conformed to a buyer's specifications.  *See New Orleans Assets, LLC v. Carl E. Woodward, LLC*, No. 01-2171, 2003 WL 21434888, at *2 (E.D. La. Jan. 23,

---

[16] *See Chevron*, 604 F.3d at 894.

[17] *See* R. Doc. 169; *see also* R. Doc. 153, Ex. 11 (Thrasher Aff. at ¶¶ 4-6 Dec. 20, 2012).

[18] R. Doc. 153, Ex. 11 (Thrasher Aff. at ¶¶ 4-6 Dec. 20, 2012).

[19] *See* R. Doc. 127, Ex. 4 (Jan Mikalsen Dep., 51:16 - 52:17, Apr. 17, 2012) (explaining that C-Innovation relied on Schilling's specifications when ordering ROVs with cables already attached from Schilling).

[20] *See* R. Doc. 127, Ex. 1 (Norm Robertson Dep., 166:3 - 167:8, Mar. 23, 2012) (explaining that C-Innovation relied on Schilling's specifications when ordering cables directly from NSW).

2003) (Feldman, J.) (citing *La. Indus. v. Bogator, Inc.*, 605 So.2d 213, 217 (La. App. 2 Cir. 1992) and *Conmaco, Inc. v. S. Ocean Corp.*, 581 So.2d 365, 371 (La. App. 4 Cir. 1991), *writ denied*, 586 So.2d 533 (La. 1991)).

NSW argues all of the cables purchased by C-Innovation, either directly or indirectly, conformed to Schilling's specifications which did not include a requirement that the cables be able to withstand twisting motions.  NSW directs the Court's attention to the deposition testimony of Phil Gibson ("Gibson"), the president of the company that tested the cables, in which Gibson stated Schilling never included a requirement that the cables be able to withstand twist in its specification to NSW.[21]  NSW also directs the Court's attention to a January 2010 email from one Schilling employee to another stating that "twist" was not a part of Schilling's specification to NSW.[22]  Additionally, NSW directs the Court's attention to a September 2005 specification provided by Schilling to NSW that has no twist specification[23] and a December 2009 revised specification provided by Schilling to NSW that included a twist specification.[24]  The December 2009 specification was sent by Schilling to NSW after the last cable at issue in this case had been delivered.[25]  NSW argues the fact that Schilling added an explicit twist specification to its December 2009 revised specification is proof that previous specifications did not include such a requirement.

To prove the Schilling specifications included a requirement that the cables be

---

[21] *See* R. Doc. 127, Ex. 3 (Philip Gibson Dep., 149:14-18, 188:5-11, Aug. 8, 2012).

[22] *See* R. Doc. 127, Ex. 32.

[23] R. Doc. 127, Ex. 39.

[24] R. Doc. 127, Ex. 40.

[25] *See* R. Doc. 169 at p. 14 (C-Innovation admits cables were delivered between January and December 2008); *see also* R. Doc. 127, Ex. 33; R. Doc. 127, Ex. 34.

operable with Schilling ROVs, including being able to withstand twist, C-Innovation directs the Court's attention to an August 2005 specification requiring that the cable be able to "safely and efficiently operate" Schilling's ROV.[26]  C-Innovation argues this specification includes the ability to withstand twist because this capability is necessary to operate the ROV safely and efficiently.  C-Innovation also directs the Court's attention to the deposition testimony of NSW design engineer Guido Lunneman ("Lunneman"), in which Lunneman explained that twist is a force inherent in the operation of an ROV, as well as the deposition testimony of Gibson, in which Gibson made statements similar to those of Lunneman.[27]  In addition, C-Innovation argues that the instructions received by NSW from Schilling were not technical specifications at all.  C-Innovation directs the Court's attention to the Schilling president's deposition testimony, in which he explained Schilling provided only general operating requirements to NSW and asked NSW to propose a cable design to conform to those general requirements.[28]  Schilling would then evaluate and determine whether the proposed design met those general requirements before placing an order.[29]

   The Court finds there are genuine issues of material fact with respect to whether Schilling issued specifications or only general operating requirements, who drafted the

---

[26] *See, e.g.* R. Doc. 169, Ex. 19 (August 31, 2005 Schilling equipment specification).

[27] *See* R. Doc. 153, Ex. 3 (Lunneman Dep., 64:2 - 67:10, June 4, 2012); R. Doc. 153, Ex. 2 (Gibson Dep., 95:17 - 97:22).

[28] *See* R. Doc. 153, Ex. 1 (Schilling Dep., 42:3 - 45:23, Oct. 23, 2012).

[29] *Id.*  C-Innovation contends the cables were designed by NSW to meet Schilling's general operating requirements, and not that Schilling provided exacting specifications which NSW then carried out, as NSW argues.  C-Innovation contends the first three ROVs it purchased from Schilling included cables Schilling ordered from NSW, which were designed by NSW, not Schilling, and which were already attached to the ROVs.  C-Innovation then ordered the rest of the ROVs from Schilling without cables attached, and ordered the cables for these ROVs directly from NSW, telling NSW to manufacture these direct-purchased cables to meet the same general operating requirements as the cables NSW manufactured and sold to Schilling.

specifications, what the specifications were, and whether the cables met those specifications. As a result, NSW is not entitled to summary judgment on its defense that the cables were designed and created in accordance with specifications.

### C.    NSW's Defense that C-Innovation Waived its Redhibitory Action

NSW also argues that C-Innovation waived its redhibitory action by accepting an NSW price quote that included an express warranty provision and language excluding all other claims, including the claim for redhibition. Under Louisiana law, a party may agree to exclude or limit the implied warranty against redhibitory defects, thus eliminating the possibility of a buyer bringing a redhibitory action for a breach of that implied warranty. LA. CIV. CODE ANN. art. 2548. The terms of the buyer's waiver, exclusion, or limitation of the warranty must be clear and unambiguous and must be brought to the attention of the buyer. *Id.* The seller bears the burden of establishing the existence of such a waiver. *Tucker v. Petroleum Helicopters, Inc.*, 08-1019 (La. App. 4 Cir. 3/23/09); 9 So.3d 966, 970 (citing *Berney v. Rountree Olds-Cadillac Co., Inc.,* 33,388 (La. App. 2 Cir. 6/21/00), 763 So.2d 799; *Moses v. Walker*, 98–58 (La. App. 3 Cir. 6/17/98); 715 So.2d 596, 598.). "In order to bear its burden that the alleged waiver of warranty was effective, [the seller] must prove that the waiver was: (1) written in clear and unambiguous language; (2) contained in the contract; and (3) either brought to the attention of the buyer or explained to him." *Id.* (citing *Boos v. Benson Jeep–Eagle Co., Inc.*, 98–1424 (La.App. 4 Cir. 6/24/98); 717 So.2d 661).

Under Louisiana contract law, terms contained in other documents may be incorporated into a contract, either by attaching those documents to the contract or by

referencing those documents in the contract. *Russellville Steel Co., Inc. v. A& R Excavating, Inc.*, 624 So.2d 11 (La. App. 5 Cir. 1993) (citing *Action Fin. Corp. v. Nichols*, 180 So.2d 81, 83 (La. App. 2 Cir. 1965). Extrinsic terms are considered part of the contract only if the parties intended for them to be so. *Nichols*, 180 So.2d at 83; *see also One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 267 (5th Cir. 2011) ("Under general contract principles, where a contract expressly refers to and incorporates another instrument in specific terms *which show a clear intent to incorporate that instrument into the contract*, both instruments are to be construed together.") (emphasis added).

NSW and C-Innovation offer different versions of the facts surrounding C-Innovation's initial purchase of cables from NSW.  It is undisputed that on July 3, 2007, NSW sent a letter to C-Innovation (the "First Letter").[30] The First Letter included waiver language and, while the date of C-Innovation's receipt of the First Letter is unclear, C-Innovation admits it did receive it.[31]   By its express language, the First Letter was valid for 30 days.[32]   It is also undisputed that, after the terms of the First Letter expired, C-Innovation sent NSW a purchase order on August 7, 2007 (the "Purchase Order").[33]  The Purchase Order includes a reference to "Quotation No.: A13303 C-Innovation - ROV Umbilical 126394.doc,"[34] which quotation number appears on the first page of the First

---

[30] *See* R. Doc. 153, Ex. 7 (July 3, 2007 letter from NSW addressed to Norm Robertson).

[31] *See* R. Doc. 169.

[32] *See* R. Doc. 153, Ex. 7.

[33] *See* R. Doc. 153, Ex. 5 (C-Innovation purchase order dated August 7, 2007).

[34] *Id*.

Letter, the term of which had by then expired by its own terms.[35]  The Purchase Order does not include any language waiving or excluding warranties, nor does it expressly incorporate the terms of the First Letter.[36]  What happened between the date of the First Letter and the date of the Purchase Order is the subject of a genuine factual dispute.  Also in dispute is whether the parties intended to incorporate extrinsic terms and conditions into the Purchase Order.

Under NSW's version of the facts, NSW sent C-Innovation a letter on July 27, 2007 (the "Second Letter"),[37] including waiver language and a price quote, in response to C-Innovation's and NSW's negotiations following the First Letter.[38]  NSW argues that C-Innovation's sending the Purchase Order in response to the Second Letter was an agreement to be bound by the language in the Second Letter, including the waiver of any redhibitory action.  Under C-Innovation's version of the facts, C-Innovation never received the Second Letter,[39] and by the time C-Innovation sent the Purchase Order to NSW, the terms of the First Letter had expired.  C-Innovation argues the waiver language in the First Letter and the Second Letter was not clear and unambiguous, nor was the language from

---

[35] R. Doc. 153, Ex. 7.

[36] *See* R. Doc. 153, Ex. 5.

[37] *See* R. Doc. 127, Ex. 11 (July 27, 2007 letter from NSW addressed to Norm Robertson).

[38] *See* R. Doc. 127, Ex. 1 (Robertson Dep., 160:16-21, Mar. 23, 2012).

[39] The First Letter included the following identifier:  "Quotation No.: A13303 C-Innovation - ROV Umbilical 126394.doc." R. Doc. 153, Ex. 7.  The Second Letter included the following identifier: "Quotation No.: A13303-2 C-Innovation - ROV Umbilical 126394.doc."  R. Doc. 127, Ex. 11.  The Purchase Order references the identifier contained in the First Letter.  *See* R. Doc. 153, Ex. 5.  C-Innovation argues it issued the Purchase Order and referred to the First Letter's identification number, and not the Second Letter's identification number, because C-Innovation never received that Second Letter.  NSW argues C-Innovation's position is untenable because of similarities between the numbers quoted in the Second Letter and the numbers in the Purchase Order, but NSW does not direct the Court's attention to anything in the record showing C-Innovation received the Second Letter.

either letter explicitly incorporated into the Purchase Order or brought to the attention of C-Innovation at the time of the execution of the Purchase Order.  As a result, C-Innovation argues it did not intend to be or agree to be bound by the terms of the First Letter or the Second Letter and did not waive its redhibitory action.

NSW has the burden of proving there are no genuine issues of material fact with respect to its waiver defense.  The Court finds the waiver language in the First Letter and the Second Letter is not sufficiently clear and unambiguous to be a valid waiver of C-Innovation's right to bring a redhibitory action, nor has it been established that the parties intended to incorporate that waiver language into the Purchase Order.  The Court also finds a factual dispute exists regarding C-Innovation's receipt of the Second Letter.  As a result, the Court cannot find C-Innovation has waived its right to bring a redhibitory action as a matter of law.   NSW is not entitled to summary judgment on this defense.

### D.   NSW's Defense that C-Innovation's Continued Use of the Cables Precludes a Redhibitory Action

Finally, NSW argues that, because C-Innovation continued to use the cables even after alleging they were defective, C-Innovation's continued use of the cables provides NSW with a defense to C-Innovation's redhibitory action.  It is undisputed that at least one of the cables was still being used by C-Innovation as late as September 2012.[40]  It is unclear when C-Innovation ceased using the other cables.   NSW is correct that, under certain circumstances, a buyer's continued use of a product after it complains of defects with that product may result in the buyer being precluded from seeking rescission of the sale.  *See,*

---

[40] While C-Innovation failed to respond to NSW's supplemental Local Rule 56.1 statement of facts regarding this issue, an earlier Local Rule 56.2 statement filed by C-Innovation explained that "C-Innovation has replaced all but one NSW cable" and that the last cable was "slated to be removed prior to the end of [2012]."  *See* R. Doc. 162.

*e.g., Coffey v. Cournoyer Oldsmobile-Cadillac-GMC, Inc.*, 484 So.2d 798, 800-801 (La. App. 1 Cir. 1986); *Cournelious v. Bailey Lincoln-Mercury, Inc.,* 566 So.2d 85, 88 (La. App. 4 Cir. 1990).

However, as recognized by C-Innovation, this defense is not always successful in cases involving a buyer's continued use of a product after complaining that product is defective. *See, e.g. Hebert v. Claude Y. Woolfolk Corp.*, 176 So.2d 814, 818 (La. App. 3 Cir. 1965). This determination is fact-intensive, and rescission should be denied on this basis only in extreme cases. The cases cited by NSW deal with products significantly easier to exchange or return than the cables at issue in this case. Because the Court construes the facts in favor of C-Innovation at this stage, summary judgment on this issue is inappropriate. This is true even if C-Innovation did continue to use some of the NSW cables after complaining about their defects. NSW is not entitled to summary judgment on its defense that C-Innovation's continued use of the cables precludes it from asserting a redhibitory action.

### E.   NSW is Not Entitled to Summary Judgment on C-Innovation's Redhibitory Action

For all of these reasons, with respect to C-Innovation's redhibitory action and NSW's asserted defenses to that claim, the Court finds there are genuine issues of material fact in dispute which preclude the entry of summary judgment in favor of NSW.

### III.   C-Innovation's Breach of Express Warranty Claim

NSW also filed a motion for summary judgment with respect to C-Innovation's breach of express warranty claim because the time period to bring that claim had expired before suit was filed. NSW bases its defense on the Second Letter, which contained a

provision that any breach of warranty claim was to be brought within twelve months from the date the cables were taken into use or no later than eighteen months from the date of delivery.[41] It is undisputed the cables at issue were delivered to C-Innovation between January and December 2008.[42] Because more than eighteen months passed after the date the last cable was delivered before C-Innovation filed suit, NSW argues C-Innovation's breach of express warranty claim is untimely.

NSW argues C-Innovation agreed to be bound by Second Letter's time limit on breach of express warranty claims when C-Innovation issued the Purchase Order because the Purchase Order contains a reference to "Quotation No.: A13303 C-Innovation - ROV Umbilical 126394.doc."[43] C-Innovation argues it never agreed to be bound by the terms of the Second Letter because it never received the Second Letter.[44] C-Innovation also argues that, because it never agreed to the terms of the Second Letter, those terms were not a part of any contract between C-Innovation and NSW, or between C-Innovation and Schilling or Phoenix. In support of its argument that C-Innovation agreed to the terms of the Second Letter, NSW directs the Court's attention to similarities between the terms of the Second Letter[45] and the terms of the Purchase Order,[46] but does not point to any direct testimony establishing that C-Innovation received the Second Letter or agreed to be bound by the

---

[41] R. Doc. 127, Ex. 11.

[42] *See* R. Doc. 169 at p. 14 (C-Innovation admits cables were delivered between January and December 2008); *see also* R. Doc. 127, Ex. 33; R. Doc. 127, Ex. 34.

[43] R. Doc. 153, Ex. 5.

[44] *See supra* note 39.

[45] R. Doc. 127, Ex. 11.

[46] R. Doc. 153, Ex. 5.

Second Letter's terms.  At the summary judgment stage, the burden of proof is on NSW to bring forward competent evidence that C-Innovation not only received the Second Letter but also agreed to its terms.  NSW has not met this burden.

 As explained above, C-Innovation's receipt of the Second Letter is a disputed issue of fact.  Even if C-Innovation did receive the Second Letter, NSW has not established that C-Innovation intended to be bound by the terms in the Second Letter.  The Purchase Order does not specifically incorporate the terms of the Second Letter or include any language setting a time limit for bringing breach of express warranty claims.[47]    Louisiana law requires a showing that parties to a contract intended to incorporate terms from an extrinsic document into that contract before it can be said those extrinsic terms are a part of the contract.  *See Nichols*, 180 So.2d at 83.  NSW has not made such a showing.  NSW's motion for summary judgment on the untimeliness of C-Innovation's breach of express warranty claim is denied.

### IV.    C-Innovation's LPLA Claim

Finally, NSW argues C-Innovation's LPLA claim is prescribed.  Under Louisiana law, a claim for damages under the LPLA is a declictual action for which "prescription commences to run from the day injury or damage is sustained."  *See* La. Civ. Code Ann. art. 3492; *see also Am. Zurich Ins. Co. v. Caterpillar, Inc.*, 12-270 (La. App. 3 Cir. 10/3/12); 99 So.3d 739, 741 (internal citation omitted) (article 3492 prescriptive period applies to claims under the LPLA).  For article 3492 purposes, "damage is considered to have been sustained only when it has manifested itself with sufficient certainty to support accrual of a cause of

---

[47] R. Doc. 153, Ex. 5.

action." *Cameron Parish Sch. Bd. v. Acands, Inc.*, 96-895 (La. 1/14/97); 687 So.2d 84, 88.

The burden at trial will be on NSW to prove that C-Innovation's LPLA claim is prescribed, and thus NSW's burden at the summary judgment stage is to demonstrate an absence of disputed issues of material fact with respect to when the defect in the cables manifested itself with sufficient certainty to support accrual of a cause of action.  NSW has not met this burden.  NSW's motion for summary judgment contains virtually no argument on this issue,[48] and NSW has not directed the Court's attention to any facts in the record establishing when the alleged defect manifested itself with sufficient certainty to support accrual of a cause of action.

The Court has found the issue of when C-Innovation had a reasonable basis to pursue a claim against NSW to be a disputed issue of fact in the context of prescription of C-Innovation's redhibitory action.  For the same reasons, the Court finds the issue of when the defect manifested itself with sufficient certainty to support accrual of a cause of action to be a disputed issue of fact.[49]  Because the material facts are in dispute, NSW is not entitled to summary judgment on this issue. NSW's motion for summary judgment that C-Innovation's LPLA claim is prescribed is denied.

## CONCLUSION

**IT IS ORDERED** that NSW's motion for summary judgment is **DENIED**.

---

[48] NSW argues in its memorandum in support, without elaboration, that C-Innovation's LPLA claim prescribed "long ago."  R. Doc. 127-1.  C-Innovation's response does not address NSW's prescription argument.  *See* R. Doc. 153.

[49] The rule for when prescription begins to run on an LPLA claim and the rule for when prescription begins to run on a redhibitory action are about the same.  *Compare Cameron Parish Sch. Bd.*, 687 So.2d at 88 *with Chevron,* 604 F.3d at 894.

New Orleans, Louisiana, this __13th__ day of March, 2013.


**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**